UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

CIVIL ACTION NO. 06-129-JBC

DORIS ARNOLD, as Administrator of the
Estate of Gerald Lynn Cornett, Deceased, PLAINTIFF,

V. MEMORANDUM OPINION AND ORDER

CORRECTIONAL MEDICAL SERVICES, INC., et al., DEFENDANTS.

\* \* \* \* \* \* \* \* \* \*

This matter is before the court on the motion for summary judgment of defendants Kenneth Isaacs, Anthony Estep, Maria Jones Gaines, Clarence McCoy, Kristine LaFoe, and Robert Williams (R. 61); and the United States Court of Appeals for the Sixth Circuit's opinion (R.166), which directs individual assessments of each of those defendants in determining whether he or she is entitled to qualified immunity from suit in his or her individual capacity.

Analyzed individually, none of the defendants enjoys immunity from suit because the evidence, viewed in a light most favorable to the plaintiff, establishes that each defendant acted with a culpable state of mind. The court, therefore, will deny the defendants' motion for summary judgment again.

I. LEGAL STANDARD

A few rules direct the individual assessments. The court – not a jury – considers whether the facts alleged by the plaintiff establish a prima facie case of deliberate indifference to serious medical needs. *Phillips v. Roane County*, 534

F.3d 531, 539 (6th Cir. 2008). The court must view those facts in a light most favorable to the plaintiff. *Id*. at 540 (citations omitted). The court must disregard any attempt by the defendants to cast the facts in a different light, because the defendants must concede the most favorable view of the facts to the plaintiff. *See id.* at 534 (citing *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998)).

## II. GERALD CORNETT'S DEATH

Although the Sixth Circuit directed individual assessments of qualified immunity, the assessments turn on a common set of facts concerning the death of Gerald Cornett.

Police arrested Cornett on an alcohol intoxication charge on August 14, 2005, and transported him to Fayette County Detention Center. Cornett's blood-alcohol content measured more than .3 when he was booked. R. 90 Ex. 9 at 24. Detention-center staff placed Cornett in the passive intake area. An individual standing in the passive intake area can see every other part of the passive intake area, except the restrooms. *See* R. 173 Ex. 1, 2. Another detainee in the passive intake area recalled that Cornett complained that he was drunk, that he was concerned about his blood-alcohol content, and that he should be seen by medical staff. R. 90 Ex. 2 ¶¶ 5, 13.

At some point later, detention-center staff called Cornett to have his photograph taken for the offender index. R. 90 Ex. 2 ¶ 8. Cornett attempted to stand up, but he stumbled, knocked his head against the wall, and fell to the floor.

2

R. 90 Ex. 2 ¶¶ 8-9. One detainee recalled that Cornett's head made a "pop" sound when it hit the floor. R. 90 Ex. 4 at 36. Another detainee confirmed that the fall made a loud sound. *See* R. 90 Ex. 2 ¶¶ 9-10; Ex. 4 at 16. The detainees saw blood in Cornett's hair and on a chair that he knocked over. *See* R. 90 Ex. 3 at 71-72. One detainee claimed that she told detention-center staff that "[t]here's blood all over that chair. He cut his head. You need to get someone to look at him." R. 90 Ex. 3 at 69, 72. That detainee, however, claimed that Cornett never received medical attention. R. 90 Ex. 2 ¶ 19.

Cornett eventually got up and had his photograph taken. Detention-center staff then laid him down on the concrete floor of an observation cell. R. 90 Ex. 3 at 2-3. Cornett fell into a coma as he lay in the cell. Detention-center staff called an ambulance, which transported Cornett to the University of Kentucky Medical Center emergency room. Doctors performed surgery for a sub-dural hematoma, but Cornett died several days later. *See* R. 159 Ex. 2.

All the defendants had contact with Cornett the night that he fell. The Sixth Circuit instructed this court to determine "what each [defendant] knew about Mr. Cornett's condition, when he or she knew it, and what, if anything, he or she did to address it." R. 166 at 3.

## II. INDIVIDUAL ASSESSMENTS

The Sixth Circuit confined its directive for individual assessments to a subset of the federal-law qualified-immunity test. *See* R. 166 at 3. The first prong of the

3

qualified-immunity test – whether the plaintiff has shown that a constitutional violation occurred – contains objective and subjective components. The Sixth Circuit ordered individual assessments under the subjective component, which requires that a plaintiff must allege facts, which, if true, would show that the official being sued had a culpable state of mind. A culpable state of mind means the official "subjectively perceived facts from which to infer substantial risk to the prisoner, that he [or she] did in fact draw the inference, and that he [or she] then disregarded that risk." *Phillips*, 534 F.3d at 540. In conducting its analysis, the court must view the evidence in a light most favorable to the plaintiff. *Id.*; R. 166 at 3.

### A. Kenneth Isaacs

Isaacs worked as a release officer the night Cornett fell. R. 157 Ex. P at 21. Isaacs did not have a view of the passive intake area, but he did hear Cornett fall. R. 157 Ex. P at 26, 57. Isaacs stood up from his desk, walked over to the passive intake area, and found Cornett lying on the ground. R. 157 Ex. P at 57. Another detainee who observed the incident recalled that a detention center employee told Cornett to "get off his ass" and come over to have his photograph taken. R. 90 Ex. 2 ¶ 10. The same detainee testified that Cornett never received medical treatment after he fell. R. 90 Ex. 2 ¶ 13.

Viewed in a light most favorable to the plaintiff, the evidence establishes that Isaacs had culpable state of mind. Isaacs perceived a substantial risk when he

4

heard Cornett fall and saw him lying on the ground. On the plaintiff's version of the facts, Isaacs would have seen the blood if he were standing as close to Cornett as he claimed. The conspicuousness of the fall and the presence of blood provide circumstantial evidence that Isaacs drew the inference that Cornett was at risk. *See Phillips*, 534 F.3d at 541. The plaintiff's version of the facts establishes that Isaacs disregarded the risk because the plaintiff's witnesses claim that Cornett never received medical attention after he fell.

    B. <u>Anthony Estep</u>

Estep was working at the triage counter the night Cornett fell. R. 90 Ex. 9 at 17. Estep's colleague, Ronald Gaunce, drew a diagram of the detention center, which one can interpret as indicating that someone at the triage counter had a view of the passive intake area and the path where staff led Cornett into the observation cell. R. 173 Ex. 2 at 44-46. Estep knew that Cornett's blood-alcohol content measured more than .3, and he observed Cornett leaning as he walked. R. 90 Ex. 9 at 24, 47.

Viewed in a light most favorable to the plaintiff, the evidence establishes that Estep had a culpable state of mind. The plaintiff's version of the facts provides sufficient circumstantial evidence that Estep perceived a substantial risk, because Estep could have seen Cornett in the passive intake area, outside the holding cell, and the blood on Cornett's head. Cornett's injury was serious enough to provide circumstantial evidence that Estep drew the inference that Cornett was at risk. *See*

5

*Phillips*, 534 F.3d at 541. The plaintiff's version of the facts establishes that Estep disregarded the risk because the plaintiff's witnesses claim that Cornett never received medical attention after he fell.

    C. <u>Maria Jones Gaines</u>

Gaines attempted to take Cornett's fingerprints and conducted visual observations of Cornett after he was laid down in the observation cell. R.155 Ex. W at 50-52. Cornett told Gaines that he wanted to sleep, so Gaines refrained from taking Cornett's fingerprints. R. 157 Ex. T at 46-47. Gaines was aware that Cornett might have fallen. R. 155 Ex. W at 45.

Gaines continued to conduct visual observations of Cornett. Gaines was supposed to observe Cornett every twenty minutes and verify that he was both conscious and responsive. *See* R. 90 Ex. 10 at 12-13. Gaines, however, merely verified that Cornett's chest was rising and falling; there is no evidence that she elicited a response from him. *See* R. 155 Ex. W at 51-52, 55, 58-60. At one point, Gaines observed Cornett's mouth twitch and his eyes partially open. R. 155 Ex. W at 55. Gaines would have observed the blood on Cornett's head since she was conducting observations after Cornett had fallen. R. 155 Ex. W at 55.

Viewed in a light most favorable to the plaintiff, the evidence establishes that Gaines had a culpable state of mind. The plaintiff's version of the facts establishes that Gaines perceived a substantial risk. Gaines was aware that Cornett might have fallen, and she observed Cornett's mouth twitch and eyes partially open.

6

Cornett's desire to sleep, moreover, could have been a symptom of his head injury rather than a manifestation of alcohol intoxication. Cornett's injury was serious enough to provide circumstantial evidence that Gaines drew the inference that Cornett was at risk. *See Phillips*, 534 F.3d at 541. The plaintiff's version of the facts establishes that Gaines disregarded the risk because the plaintiff's witnesses claim that Cornett never received medical attention after he fell.

    D. <u>Clarence McCoy</u>

McCoy served as the rover the night Cornett fell. R. 90 Ex. 35 at 16. Like Gaines, McCoy was assigned to conduct twenty-minute observations of Cornett. R. 90 Ex. 35 at 30. McCoy had heard that Cornett had a head injury and bruises. *See* R. 90 Ex. 35 at 13, 15. On the plaintiff's view of the facts, McCoy would have observed the blood on Cornett's head because he conducted the observations after Cornett fell.

At one point, McCoy entered Cornett's cell because McCoy wanted to take Cornett's blood-alcohol content reading again. McCoy attempted to make Cornett sit up, but Cornett was unresponsive. R. 157 Ex. V at 67-68. Gaines entered the cell around that time. McCoy attempted to rouse Cornett by applying a sternum rub, and both he and Gaines attempted to apply a clavicle notch. R. 157 Ex. V at 67-68. After those techniques proved unsuccessful, McCoy informed the intake shift commander, Kristine LaFoe, that Cornett needed medical attention. R. 157 Ex. V at 68.

7

Viewed in a light most favorable to the plaintiff, the evidence establishes that McCoy had a culpable state of mind. McCoy perceived substantial risk because he observed Cornett multiple times before the final encounter, he knew that Cornett had fallen, and he would have seen the blood on Cornett's head. Cornett's injury was serious enough to provide circumstantial evidence that McCoy drew the inference that Cornett was at risk. *See Phillips*, 534 F.3d at 541. The plaintiff's version of the facts establishes that McCoy disregarded the risk. Although McCoy ultimately notified LaFoe that Cornett needed medical attention, the plaintiff's version of the facts suggests McCoy perceived a serious medical need earlier.

E. Kristine LaFoe

LaFoe, who was the intake shift commander the night Cornett fell, sat at a commander's desk near the front door. R. 173 Ex. 1; Ex. 3 at 35-36. The record leaves open the possibility that someone sitting at that desk had a view of the passive intake area and the path where detention-center staff led Cornett into the observation cell. *See* R. 173 Ex. 1; Ex. 3 at 35-36.

LaFoe learned that Cornett had fallen from detention center officer Ronald Gaunce. R. 90 Ex. 12. An unknown staff member advised LaFoe that a nurse had seen Cornett after the fall and cleared him to remain in custody. R. 90 Ex. 14 at 27. Later, however, McCoy advised LaFoe that Cornett was unresponsive. LaFoe went to the observation cell, where Cornett was lying. R. 90 Ex. 13; Ex. 14 at 36. LaFoe initiated an emergency medical code. A nurse examined Cornett and

8

determined that he needed to go to the hospital. LaFoe instructed Corporal Robert Williams to accompany Cornett to the emergency room. R. 90 Ex. 14 at 47-48.

After Cornett arrived at the emergency room, a doctor called LaFoe and asked her if there were any special circumstances or incidents regarding Cornett's arrest. R. 173 Ex. 3 at 81. LaFoe failed to mention anything about Cornett's fall. *Id*.

Viewed in a light most favorable to the plaintiff, the evidence establishes that LaFoe had a culpable state of mind. LaFoe perceived a substantial risk, because she knew Cornett was unresponsive after he fell. Cornett's injury was serious enough to provide circumstantial evidence that LaFoe drew the inference that Cornett was at risk. *See Phillips*, 534 F.3d at 541. The plaintiff's version of the facts establishes that LaFoe disregarded the risk, because LaFoe failed to mention anything about Cornett's fall in the face of a doctor's inquiry about special circumstances or incidents surrounding Cornett's arrest.

F. Robert Williams

Williams escorted Cornett to the University of Kentucky Medical Center emergency room. Williams knew Cornett had fallen. R.90 Ex. 25 at 33. Emergency room records, however, indicate that detention-center staff told emergency-room staff that Cornett exhibited signs of "old stroke." R. 90 Ex. 24. The emergency room records lack any notation that Cornett fell; instead, *See* R. 90 Ex. 23, 24. A University of Kentucky police officer who was in the emergency

9

room testified that he never recalled detention-center staff having any discussions with emergency-room staff. R. 90 Ex. 26 at 28.

Viewed in a light most favorable to the plaintiff, the evidence establishes that Williams had a culpable state of mind. Williams perceived a substantial risk. The reason Williams had contact with Cornett was because Cornett was unresponsive and had to go to the emergency room. Cornett's injury was serious enough to provide circumstantial evidence that Williams drew the inference that Cornett was at risk. *See Phillips*, 534 F.3d at 541. The plaintiff's version of facts establishes that Williams disregarded the risk because Williams never told emergency-room staff that Cornett had fallen and hit his head.

Williams claims that he is entitled to qualified immunity even if he failed to report all relevant information to emergency-room staff. *Miller v. Calhoun County*, 408 F.3d 803, 822 (6th Cir. 2005). *Miller* is distinguishable. In *Miller*, the detainee initially was responsive and had a strong and steady pulse. No concrete indication of a serious medical problem existed until the detainee had a seizure. *Id*. at 822. When that happened, the jail official contacted a physician. *Id*. Here, by contrast, Williams knew that Cornett had fallen and was unresponsive, but the plaintiff's version of the facts indicates that Williams failed to mention anything about it to emergency-room staff.

### III. STATE-LAW QUALIFIED OFFICIAL IMMUNITY

In its memorandum opinion and order of June 18, 2008, this court held that

the defendants in their individual capacities are not entitled to qualified official immunity under state law. R. 123 at 9-10. The Sixth Circuit did not address state-law immunity in its opinion.

The parties, however, have made additional arguments about the issue in their supplemental briefs. They dispute whether the defendants performed ministerial or discretionary acts. If the acts were ministerial, the defendants cannot claim official immunity as long as the plaintiff establishes tort liability. *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001). If the acts were discretionary, the plaintiff also must prove that the defendants failed to act in good faith. *Id*.

In the June 18, 2008 memorandum opinion and order, the court declined to decide whether the acts were ministerial or discretionary. The court assumed, for purposes of the motion, that the acts were discretionary and concluded that the evidence was sufficient to prove that the defendants acted in bad faith. R. 123 at 10.

The court need not revisit that conclusion. The facts that the court recited in the federal-law qualified-immunity analysis above apply to each defendant under the state-law analysis. Even if the defendants' acts were discretionary, the evidence, viewed in a light most favorable to the plaintiff, establishes that each defendant failed to act in good faith. Therefore, the defendants in their individual capacities may not claim qualified official immunity under state law.

## IV. CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that defendants' motion for summary judgment (R. 61) is **DENIED**.

**IT IS FURTHER ORDERED** that within thirty-five days of the date of this order, the parties shall submit a proposed schedule for the remainder of this action.

Signed on September 27, 2010

JENNIFER B. COFFMAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY